## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **EXIDE TECHNOLOGIES,** *et al.*,[1] | : | |
| | : | Case  No.02-11125 (KJC) |
| Reorganized Debtors | : | |
| | : | |
| | : | |
| **EXIDE TECHNOLOGIES,** | : | Adv. Pro. No. 10-52766 (KJC) |
| Plaintiff | : | |
| v. | : | |
| | : | |
| **ENERSYS DELAWARE, INC.,** f/k/a | : | (Re: docket no. 5) |
| **ENERSYS, INC.,** | : | |
| Defendant | : | |

## <u>MEMORANDUM</u>[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On June 1, 2010, the United States Court of Appeals for the Third Circuit issued an

opinion determining that an agreement between Exide Technologies ("Exide") and Enersys

Delaware, Inc. ("Enersys") governing the use of certain trademarks licensed to Enersys was not

an executory contract and could not be rejected.  *In re Exide Tech.*, 607 F.3d 957 (3d Cir. 2010).

On August 20, 2010, in an attempt to circumvent this ruling by the Court of Appeals, Exide filed

a complaint (the "Complaint") seeking a declaratory judgment about the effect of plan

confirmation upon the continued right of Enersys to use these trademarks. On September 20,

---

[1]The reorganized debtors in this case are: Exide Technologies, Exide Delaware, L.L.C.; Exide Illinois, Inc.; RBD Liquidation, L.L.C.; Dixie Metals Company; and Refined Metals Corporation (the "Debtors").

[2]This court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b) and §157(a).  Venue is proper pursuant to 28 U.S.C. §1409. This adversary proceeding involves a core matter pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A), (L) and (O).

2010, Enersys filed a motion to dismiss the adversary proceeding (the "Motion to Dismiss") (docket no. 5). The parties filed briefs regarding the Motion to Dismiss and oral argument was heard on February 11, 2011. A brief, follow-up telephonic status conference with counsel was held on October 16, 2012. For the reasons set forth herein, the Motion to Dismiss will be granted.

Undisputed Facts

In 1991, Exide entered into a series of agreements with Enersys for the sale of substantially all of Exide's industrial battery division.[3] The parties executed over twenty-three agreements as part of the 1991 transaction, including (i) the Trademark and Trade Name License Agreement (the "License Agreement"), (ii) the Asset Purchase Agreement, and (iii) the Administrative Services Agreement.[4] As part of the 1991 transaction, Enersys paid Exide in excess of $135 million and, in exchange, Exide transferred to Enersys various assets related to Exide's industrial battery business, including manufacturing plants, equipment, and certain intellectual property rights.

Exide owns a trademark, used in connection with its battery business (the "Exide Mark"), that it wanted to continue using outside of the industrial battery business, while Enersys wanted to use the Exide Mark in connection with its industrial battery business. Under the License Agreement, Exide granted Enersys a perpetual, exclusive, worldwide, royalty-free license to use

---

[3] The 1991 documents were between Exide and Yuasa Battery (America), Inc., predecessor-in-interest to Enersys.

[4] These three agreements, together with a letter agreement dated December 27, 1994, have been the crux of the on-going dispute between Exide and Enersys (collectively, referred to herein as the "Agreement"). This Court ruled that the agreements were a single, fully integrated, unambiguous document. *See* 11/20/03 Tr. 25:23-26:4 (main case docket no. 3392). This decision was not appealed.

certain trademarks and tradenames, including the Exide Mark, on products sold within Enersys'

industrial battery business.

On April 15, 2002, Exide and certain affiliates filed voluntary chapter 11 bankruptcy

petitions. On March 14, 2003, Exide filed notices of rejection for the Agreement (main case

docket nos. 1614, 1615, 1617, and 1618).  Enersys objected (strenuously) to the notices to reject

the Agreement, arguing, among other things, that the Agreement was not an executory contract

and, even if it was executory, the Court should deny rejection because Enersys's rejection

damages would outweigh the benefit realized by Exide in regaining the use of the Exide Mark.

In March 2004, an eight-day hearing was held on the rejection issue.[5]

On April 21, 2004, this Court confirmed the Joint Plan of Reorganization of the Official

Committee of Unsecured Creditors and the Debtors dated March 11, 2004 (the "Plan") (main

case docket no. 3918).

On April 3, 2006, this Court entered an order authorizing Exide to reject the Agreement

(main case docket no. 5377, 5378) (the "Rejection Order").[6]  The parties entered into a transition

plan providing that, over a period of 30 months, Enersys would wind down and, eventually, stop

using the Exide Mark. The transition plan was approved by an Order dated June 30, 2006 (main

case docket no. 5521) (the "Transition Plan Order").  Enersys appealed the Rejection Order,

which was affirmed by the United States District Court for the District of Delaware (the "District

---

[5]The litigation regarding Exide's attempt to reject the Agreement, through its appeal to the Third
Circuit and subsequent remand to the Bankruptcy Court, is referred to herein as the "Rejection
Litigation."

[6]*In re Exide Tech.*, 340 B.R. 222, 227 (Bankr.D.Del. 2006), *aff'd* 2008 WL 522516 (D.Del Feb.
27, 2008), *vacated and remanded* 607 F.3d 957 (3d Cir. 2010), *cert. denied* 131 S.Ct. 1470, 179 L.Ed.2d
299 (2011).

Court"). Enersys appealed the District Court's Order.

On June 1, 2010, the United States Court of Appeals for the Third Circuit issued an opinion holding that the Agreement was not an executory contract and could not be rejected.  *In re Exide Tech.*, 607 F.3d 957 (3d Cir. 2010).  The Third Circuit determined that the Agreement was not executory because, as of the date of the bankruptcy filing, it did not contain at least one ongoing material obligation for Enersys.  *Id.* at 964.  The Third Circuit vacated the District Court's Order and remanded the case to the District Court "for further proceedings consistent with this opinion."  The case was subsequently remanded to this Court.

On August 27, 2010, this Court entered an Order vacating the Rejection Order and the Transition Plan Order (main case docket no. 6400), which was amended by Order dated October 12, 2010 (main case docket no. 6422).

Exide then commenced this adversary proceeding, seeking a declaratory judgment that: (i) Enersys' rights under the Agreement are claims against Exide that were discharged by confirmation of the Plan pursuant to Bankruptcy Code §1141(d) and Article X.H. of the Plan, and (ii) the Exide Mark was an asset of the bankruptcy estate that vested in Reorganized Exide free and clear of Enersys' limited interest in using the mark pursuant to Bankruptcy Code §1141(c) and Article V.B. of the Plan.[7]

Enersys moves to dismiss the Complaint, arguing that Exide seeks to circumvent the

---

[7]Exide's Complaint sets forth three counts:

(i)     Count I seeks declaratory judgment that Enersys' right to use the Exide Mark under the Agreement is a "claim," as defined by section 101(5) of the Bankruptcy Code, that has been discharged;

(ii)    Count II seeks declaratory judgment that the Exide Mark vested in Reorganized Exide free and clear of Enersys' alleged interest to use the mark under the Agreement; and

(iii)   Count III seeks alternative relief, asking the Court to enter a transition plan to facilitate an orderly unwinding of its prior orders.

4

Third Circuit's decision and is barred by doctrines of *res judicata,* judicial estoppel, forfeiture and laches.  Enersys also argues that Exide's claims fail on their merits because (i) its rights are not "claims" that were discharged by the Plan since Exide did not breach the Agreement prepetition, and (ii) Bankruptcy Code §1141(c) provides that "property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor" and Enersys is not a creditor, equity security holder or general partner of the Debtor.

Standard - Motion to Dismiss

Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted.  "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F.Supp.2d 404, 407 (D.Del. 2007) citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S.544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).   When considering a motion to dismiss for failure to state a claim, the court should conduct a two-part analysis:

> First, the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, the [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts. . . . This "plausibility" determination will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

5

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009)(internal citations and punctuation omitted).

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied on in the complaint." *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002), citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). The movant carries the burden of demonstrating that dismissal is appropriate. *Intel Corp.*, 496 F.Supp.2d at 408.

<u>Discussion</u>

A.   <u>Whether plan confirmation caused the Exide Mark to vest in Reorganized Exide Technologies free and clear of any interest by Enersys?</u>

Count II of the Complaint seeks a declaratory judgment that, upon confirmation of the Plan, the Exide Mark vested in Reorganized Exide free and clear of Enersys' alleged interest pursuant to Bankruptcy Code §1141(c) and Article V.B. of the Plan.[8]   Exide analogizes Enersys' interest in the Exide Mark to a lien that may be eliminated by plan confirmation. As explained in the *Airadigm* decision by the Seventh Circuit Court of Appeals:

> Under some circumstances, a reorganization plan's silence regarding a creditor's continuing secured interest in the debtor's property can result in the elimination of the creditor's lien. Section 1141(c) of the bankruptcy code provides that "after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors. . . ." 11 U.S.C. §1141(c). As applied to liens

_____

[8]Bankruptcy Code §1141(c) provides, in pertinent part, that "after confirmation of plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." 11 U.S.C. §1141(c). Section V.B. of the Plan provides, in pertinent part:

> Except as otherwise provided in the Joint Plan, on and after the Effective Date, all property of the Debtors' Estates, and any property acquired by the Debtors or Reorganized Debtors under the Joint Plan, shall vest in the respective Reorganized Debtors, free and clear of all Claims, liens, charges, or other encumbrances.

The Plan at 19.

6

and security interests, this means that "unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation. *In re Penrod*, 50 F.3d 459, 463 (7th Cir. 1995). This "default rule" applies provided that the creditor "participated in the reorganization" and, as required by §1141(c) and at issue here, the property was "dealt with by the plan." *Id.* In other words, if a secured creditor participates in the debtor's bankruptcy and the ultimate plan does not preserve the creditor's interest, the interest is gone.

*Airadigm Commc'n, Inc. v. FCC (In re Airadigm Commc'n, Inc.)*, 519 F.3d 640, 647-48 (7th Cir. 2008).

The *Airadigm* Court determined that, before a lien can be extinguished, a court must examine whether a plan actually "deals with" the property at issue.[9] The *Airadigm* Court determined that the plan did not deal with the FCC's security interest in certain personal communications services ("PCS") licenses because all of the parties, including the bankruptcy court, assumed that the FCC had validly cancelled the licenses upon the debtor's bankruptcy filing in 1999. *Airadigm*, 519 F.3d at 649. A later decision by the United States Supreme Court determined that the FCC could not cancel PCS licenses based on a bankruptcy filing. *FCC v. NextWave Personal Commc'n, Inc.*, 537 U.S. 293, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). The *Airadigm* parties disagreed about the effect of the 2000 reorganization plan on the PCS licenses. The *Airadigm* Court wrote:

> But for the plan to "deal[] with" property for purposes of §1141(c), the plan itself must give some indication that it has compensated the creditor for or otherwise impliedly affected its interest. In other words, there must be some evidence that the powers to affect the creditor's interest contained in the bankruptcy code - - to exchange, extinguish, impair or otherwise impact the interest - - have in some way been exercised - - whether expressly or impliedly.

*Airadigm*, 519 F.3d at 649. Although the *Airadigm* plan set out contingencies in the event the

---

[9]Enersys disputes that its interest is analogous to a security interest but, because of the result herein, this issue need not be addressed.

FCC reinstated the licenses by a certain date, the Court decided that treatment did not sufficiently "deal with" the licenses that had not been cancelled.

Here, Exide chose to "deal with" Enersys' rights in the Exide Mark by moving to reject the Agreement which included those rights.  The Disclosure Statement described the parties' positions in the Rejection Litigation that was pending at the time of confirmation and noted that:

> If the Debtors are authorized to reject the EnerSys Contracts, including the trademark licensing agreement, the Debtors assert that they will be able to use the "Exide" trademark in marketing industrial batteries, and believe that they would enjoy significant economic benefits from being able to market all of their products under a single brand.  However, the Debtors have not quantified the amount of such benefits.  In addition, the Debtors assert that EnerSys will be unable to use the "Exide" trademark in any market in connection with any products.  In the event the Debtors prevail in their efforts to reject the EnerSys Contracts, no additional consideration would flow to unsecured creditors under the Joint Plan.  Rather, any benefit from the rejection would inure to the benefit of Reorganized Exide.

Disclosure Statement For Joint Plan of Reorganization of the Official Committee of Unsecured Creditors and the Debtors, filed March 15, 2004 (the "Disclosure Statement") (main case docket no. 3919).  Thus, Exide's Plan "dealt with" Enersys' rights in the Exide Mark by moving to reject the Agreement under Bankruptcy Code §365 in order to regain the exclusive right to use the Exide Mark.[10]  The Third Circuit subsequently held that Exide could not reject the Agreement and, it follows, that Exide could not deprive Enersys of its rights to the Exide Mark under that Agreement.  It is disingenuous for Exide to assert now that, regardless of the outcome of the Rejection Litigation, it still "wins" because a boilerplate provision of the confirmed Plan purported to divest Enersys of its interest by default.  The "default rule" of §1141(c) should not

---

[10]Whether rejection of the Agreement actually would terminate Enersys' right to use the Exide Mark is an unresolved issue that need not be addressed here.  *See Exide*, 607 F.3d at 964-68 (Ambro, J. concurring).

override the specific information disclosed to all parties, including the Court, regarding the

manner in which Enersys' interests were being treated under the Plan.[11]

      Count II of the Complaint will be dismissed.

B.    <u>Whether Enersys' right to use the Exide Mark is a "claim" that was discharged by Plan
confirmation?</u>

      In Count I of the Complaint, Exide seeks a declaratory judgment that Enersys' right to

use the Exide Mark is a "claim," as defined by Bankruptcy Code §101(5), that has been

discharged by the confirmed Plan pursuant to Bankruptcy Code §1141(d) and Section X.H. of

the Plan.[12]  Prior to confirmation, Exide filed a notice of its intent to reject the Agreement to

---

[11]In large, complex cases, like *Exide*, the number of issues faced by the parties during the course
of a chapter 11 proceeding can be daunting.  This is no less true for the Court.  During the confirmation
process, culminating at the confirmation hearing, many issues, open during administration of the case, are
resolved, or, if not resolved, disposed of by the Court.  Some issues, which need not be resolved prior to
confirmation of a plan, remain open for disposition by the Court after confirmation, like the Rejection
Litigation. The hearing on the Debtors' request for authority to reject the Agreement concluded on March
31, 2004, a mere sixteen days before the confirmation hearing on April 16, 2004.  Post-hearing briefs in
the Rejection Litigation were filed just three days before the confirmation hearing. Enersys argues - - and
the Court certainly understood - - that confirmation of the Plan would not affect the Rejection Litigation,
a matter which the Court had so recently taken under advisement.

[12]Bankruptcy Code §1141(d)(1) provides, in pertinent part, that confirmation of a plan
"discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a
kind specified in section 502(g) [rejection damages and damages in connection with swap agreements,
securities contracts, and other contracts set out in §562 ], 502(h) [claims arising from recovery of property
under §522, §550 or §553], or 502(i) [certain post-petition taxes]."  Bankruptcy Code §101(12) defines
"debt" as "liability on a claim."
      Section X.H. of the Plan provides:
      Except as otherwise provided herein: (1) the rights afforded herein and the treatment of
      all Claims . . . herein, shall be in exchange for and in complete satisfaction, discharge and
      release of Claims. . . of any nature whatsoever, including any interest accrued on Claims
      from and after the Petition Date, against any Debtor or any of its assets or properties, (2)
      on the Effective Date, all such Claims against . . . any Debtor shall be satisfied,
      discharged and released in full and (3) all Persons and Entities shall be precluded from
      asserting against the Debtor, the Reorganized Debtors, their successors, assets or
      properties, any other or further Claims . . . based upon any act or omission, transaction or
      other activity of any kind or nature that occurred prior to the Confirmation Date . . . .
The Plan at 35.

regain use of the Exide Mark.  Typically, a claim arising from the rejection of an executory

contract is discharged by confirmation of the plan.  11 U.S.C. §1141(d)(1)(A).   In this case,

however, the Third Circuit later determined that the Agreement was not executory and could not

be rejected.  Thus, this case does not present a claim for rejection damages pursuant to

Bankruptcy Code §365 that is dischargeable as a pre-petition claim pursuant to Bankruptcy Code

§1141 and §502(g).

The Bankruptcy Code defines a "claim" to mean:

(A)    right to payment, whether or not such right is reduced to judgment,
        liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
        undisputed, legal, equitable, secured, or unsecured; or

(B)    right to an equitable remedy for breach of performance if such breach
        gives rise to a right to payment, whether or not such right to an equitable
        remedy is reduced to judgment, fixed, contingent, matured, unmatured,
        disputed, undisputed, secured, or unsecured.

11 U.S.C. §101(5).  Enersys points out that it had neither a right to payment nor a right to an

equitable remedy for breach of performance prior to plan confirmation because Exide had not

breached the Agreement.  In response, Exide asserts that Enersys' view of the term "claim" is

too narrow.  Exide argues that the Code's definition of "claim" is intended to be broad, as

recognized by the Third Circuit in *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d

114 (3d Cir. 2010) which reviewed the House and Senate Reports discussing the Code's

definition of claim:

In adopting a new definition of "claim," the Reports state that "[b]y this *broadest
possible definition* [of the term 'claim'] . . . the bill contemplates that all legal
obligations of the debtor, no matter how remote or contingent, will be able to be
dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in
the bankruptcy court."

*Grossman's*, 607 F.3d at 121 (emphasis and alterations in original) citing H.R.Rep. No. 95-595

at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266. *See also Nextwave*, 537 U.S. at 302-

03 ("We have said that "claim" has the broadest available definition and have held that the plain

meaning of a "right to payment" is nothing more nor less than an enforceable obligation.")

(internal quotations and alterations omitted).

   While the Bankruptcy Code's definition of claim is undeniably broad, it is not without

limit.  The definition of a "claim" includes a "right to payment" that may be contingent or

unmatured, but it necessarily requires a pre-confirmation event that triggers a "right to payment,"

whether based upon a breach of contract,[13] tortious conduct,[14] or a prepetition contract that

provides for a right to payment, even if that right to payment is contingent.[15]

---

[13] *See, e.g., The Kilbarr Corp. v. General Services Admin. (In re Remington Rand Corp.*), 836
F.2d 825 (3d Cir. 1988)(deciding that the government had a "claim" under bankruptcy law, even if it
could not yet be asserted, when a pre-confirmation audit confirmed that the government had a right to
payment from the debtor for prepetition breaches of contract).

[14] *See, e.g., Grossman's*, 607 F.3d at 125 (holding that "a 'claim' arises when an individual is
exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to
payment' under the Bankruptcy Code).  In *Grossman's*, the Third Circuit Court, sitting *en banc*,
overruled the "accrual test" set forth in *Avellino & Bienes v. M. Frenville Co., Inc. (Matter of M. Frenville
Co., Inc.),* 744 F.2d 332 (3d Cir. 1984).  *Grossman's*, 607 F.3d at 121.  The *Frenville* accrual test
provided that "'the existence of a valid claim depends on (1) whether the claimant possessed a right to
payment; and (2) when that right arose' as determined by reference to the relevant non-bankruptcy law."
*Grossman's*, 607 F.3d at 119 citing *Remington Rand,* 836 F.2d at 830. The Third Circuit acknowledged
that criticism of *Frenville's* accrual test was justified, given its narrow interpretation of a "claim" under
the Bankruptcy Code.  *Grossman's*, 607 F.3d at 121.
   Here, there was no pre-confirmation injury or breach of contract that established a right to
payment in connection with Enersys' right to use the Exide Mark under the Agreement. Therefore,
Enersys did not have a "claim," regardless of whether one applies the *Grossman's* test or the narrow test
of *Frenville* (which should be used to determine whether claims are dischargeable in bankruptcy cases
with reorganization plans that were proposed and confirmed prior to the June 2, 2010 decision in
*Grossman's*). *See Wright v. Owens Corning*, 679 F.3d 101 (3d Cir. 2012).

[15] *See, e.g., In re Rodriguez*, 629 F.3d 136, 142 (3d Cir. 2010) (prepetition loan documentation
establishing a debtor's obligation to make payments into an escrow account constitutes a claim by the
lender for unpaid escrow amounts, even though the lender's ability to collect funds from the escrow
account is contingent upon other events); *Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.)*, 64
F.3d 141, 145 (4th Cir. 1995) (prepetition non-executory contract obligating a debtor to pay money post-
petition is a pre-petition claim), *In re APF Co.*, 270 B.R. 567 (Bankr.D.Del. 2001) (prepetition merger

Here, the Complaint does not allege any facts that would give rise to a pre-confirmation "right to payment" to Enersys for its use of the Exide Mark.  The Complaint alleges that Enersys is the "holder of an unsecured claim" based upon its rights under the Agreement "namely, Exide's obligation to permit Enersys's use of the EXIDE mark and Exide's obligation to forbear from using the EXIDE mark on industrial products."  (Complaint, ¶2).  The Complaint further alleges that "a breach of these obligations results in damages that can be calculated with a reasonable degree of certainty, thereby providing a monetary award as a viable alternative to any equitable remedy that EnerSys may have under applicable law."  (Complaint, ¶3).

Allegations in the Complaint reflect that Exide's obligations under the Agreement require Exide to permit Enersys' use of the Exide Mark and to, itself, forbear from using the Exide Mark on industrial battery products.  These allegations do not assert facts creating a "right to payment" but establish that Enersys' rights in the Exide Mark under the Agreement are in the nature of an interest, not a right to payment or even a contingent right to payment.  *See Cheslock-Bakker & Assoc., Inc. v. Kremer (In re Downtown Athletic Club of New York City, Inc.)*, 2000 WL 744126, *3 & n.4 (S.D.N.Y. June 9, 2000) (debtor's obligation to a non-debtor under the Rent Stablilization Law of the City of New York does not create a right to payment and is not a "debt" (i.e., "liability on a claim") subject to discharge).

Moreover, the Complaint does not assert facts, but merely a legal conclusion that Enersys is a "holder of an unsecured claim" and the supposition that a "breach would result in damages." Notably, the Complaint does not assert that Exide breached its obligations related to Enersys'

agreement that established schedule for postpetition payments in consideration for acquisition of company gives rise to a prepetition claim). *See also Remington Rand*, 836 F.2d at 830 citing *Frenville*, 744 F.2d at 336 (discussing that "an indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement.")

12

use of the Exide Mark pre-confirmation, triggering any right to payment held by Enersys.

The Complaint also asserts that, in the Rejection Litigation, Enersys submitted expert

testimony that:

> EnerSys would suffer damages over a seven-year period from price erosion, profit
> on lost sales and incremental rebranding expense if it lost use of the mark . . .
> EnerSys described these damages, which assumed a sudden loss of the mark
> without an orderly transition, as "substantial, real, and immediate."

(Complaint, ¶26).    Again, this assertion reflects only a potential rejection damage claim.  Since

the Third Circuit has held that the Agreement was not executory and could not be rejected, this

argument by Exide does not support a plausible claim for relief based on a pre-confirmation right

to payment.

In short, Exide's Complaint does not allege facts to support its position that a "claim"

exists under Bankruptcy Code §101(5)(A) based upon a pre-confirmation breach of contract,

tortious conduct, or contract provision triggering a pre-confirmation right to payment for

Enersys' use of the Exide Mark.[16]

Exide also argues that Enersys holds a dischargeable "claim" based on Bankruptcy Code

§101(5)(B) because, by asserting its large rejection damage claim, Enersys admitted that any

right to an equitable remedy could be reduced to a right to payment.  However, the language of

§101(5)(B) provides, in relevant part, that a "claim" includes a "right to an equitable remedy *for*

*breach of performance* if such breach gives rise to a right to payment . . . ."  (emphasis added).

---

[16]In its Brief opposing the Motion to Dismiss, Exide asserts that the indemnification provision in
the pre-petition Agreement creates a pre-confirmation contingent right to payment for Enersys.  However,
Count I of the Complaint asks specifically for a declaratory judgment that Enersys's *right to use the Exide
Mark* under the Agreement is a claim.  Although any indemnification obligation under the Agreement
might become a "claim," Enersys' right to *use* the Exide Mark, without more, does not create a right to
payment.

As discussed above, the Complaint does not assert that Exide breached its performance of the Agreement pre-confirmation.  Therefore, Exide's reliance on Bankruptcy Code §101(5)(B) is also misplaced.

Count I of the Complaint will be dismissed.

C.    Whether Counts I and II are barred  by judicial estoppel?

"[J]udicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency." *Montrose Medical Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).  Judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) *quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996).    The rationale behind the doctrine of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately changing their positions.  *Pickett v. Integrated Health Serv., Inc. (In re Integrated Health Serv., Inc.)*, 304 B.R. 101, 109 (Bankr.D.Del. 2004) citing *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Courts typically review a non-exhaustive list of factors to inform the decision whether to apply judicial estoppel in a particular case.  *Integrated* Health, 304 B.R. at 109 citing *New Hampshire*, 532 U.S. at 750.  The Third Circuit Court of Appeals has relied, generally, on at least three requirements: (1) the party estopped must have taken two positions that are irreconcilably inconsistent, (2) the party changed his or her position in bad faith, i.e., with intent to play fast and loose with the court, and (3) the judicial estoppel sanction is tailored to address

14

the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. *Montrose*, 243 F.3d at 779-80.

Exide's prosecution of Counts I and II of the Complaint warrant imposition of judicial estoppel. First, Exide's treatment of the Agreement as an executory contract in the Rejection Litigation and the Plan confirmation process is inconsistent with its current position that Plan confirmation discharged Enersys' claims to use of the Exide Mark and caused the Exide Mark to vest as property of Reorganized Exide free and clear of any liens. Second, Exide's current assertion of its position in Counts I and II is made in bad faith to circumvent the decision of the Third Circuit in the Rejection Litigation. Finally, acceptance of Exide's current position in Counts I and II would provide an unfair advantage to Exide, as it would allow Exide to gain control over the Exide Mark despite the Third Circuit's decision that the Agreement was not executory and could not be rejected. Applying judicial estoppel in this instance directly addresses the unfair advantage that Exide seeks to gain through new inconsistent positions asserted in its Complaint.

In addition to the reasons for dismissal of Counts I and II as set forth above, I conclude that it is appropriate to apply the sanction of judicial estoppel to this matter and dismiss Counts I and II.

## Conclusion

For the reasons set forth above, I conclude that Counts I and II should be dismissed because the Complaint fails to set forth facts to support its claim that Enersys' right to use the Exide Mark was a "claim" subject to discharge under Bankruptcy Code §1141(d)(1) or could be

extinguished by default under Bankruptcy Code §1141(c). Alternatively, Counts I and II should

be dismissed under the sanction of judicial estoppel.  Count III will also be dismissed.[17]

An appropriate order follows.

BY THE COURT:

_____

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  January 8, 2013

---

[17]Because the Court of Appeals' decision is now more than two years old and the Motion to
Dismiss has been pending for some time, I do not perceive that a new transition period is appropriate - -
or would be fair to Enersys. The relief granted by the Third Circuit in June 2010 should not be delayed
any longer. Count III will also be dismissed.

16